IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SERVICIOS TECHNOLOGICOS DE
GUATEMALA, S.A.,

                     Plaintiff,                    OPINION & ORDER

    v.

                                                  13-cv-601-wmc

WOCCU SERVICES GROUP, INC.,

                     Defendant.

---

       Plaintiff Servicios Technologicos de Guatemala, S.A. ("ServiTech") brings claims against defendant WOCCU Services Group, Inc. ("WSG") for alleged breach of an agreement to license support software for ATM services. WSG has counterclaimed for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation pursuant to Wis. Stat. § 100.18 and indemnification. Before the court are the parties' cross-motions to dismiss. (*See* dkt. ## 15, 18.) For reasons explained below, the court concludes that neither party's arguments have merit and will deny all motions to dismiss.[1]

ALLEGATIONS OF FACT[2]

**I.  ServiTech's Amended Complaint**

       ServiTech is a company organized and existing under the laws of the nation of Guatemala. WSG is a corporation organized and existing under the laws of the state of Wisconsin, with its principal place of business in Madison, Wisconsin.

---

[1] The current motions to dismiss pertain to the Amended Complaint (dkt. #10) and the Amended Counterclaim (dkt. #16). The parties' motions to dismiss the original complaint (dkt. #7) and counterclaims (dkt. #11) are denied as moot.

[2] For purposes of resolving WSG's motion to dismiss, the court accepts all well-pled facts in ServiTech's Amended Complaint as true and draws all inferences in its favor. For purposes of resolving ServiTech's motion to dismiss, the court accepts all well-pled facts in WSG's Amended Counterclaim as true and draws all inferences in its favor. Not surprisingly, the parties' versions conflict, so what follows are the two separate and conflicting versions of the operative facts.

ServiTech and WSG entered into a non-exclusive licensing agreement (the "License Agreement") on June 22, 2009.  Under that agreement, WSG licensed certain software from ServiTech.  Effective July 31, 2011, the parties entered into an "Amendment to the License Agreement" (the "Controlling Agreement"), which constituted the controlling contract between the parties after that date.

Pursuant to the Controlling Agreement, ServiTech granted WSG a license to use software in Latin America and throughout the world, including Ecuador.  The Controlling Agreement also provided that WSG or its delegated representative would have the right to grant sublicenses to the full scope of the right and license granted to WSG, consistent with the Controlling Agreement's terms.  In exchange, WSG agreed to pay ServiTech "license and support fees" for the right to install the software in a limited number of credit unions specified for individual countries.  For example, in Ecuador, WSG was specifically granted the right to sublicense and install software in thirty credit unions, which would then gain the right to use the software from WSG or its delegated representatives.[3]

Under the Controlling Agreement, ServiTech was permitted to conduct periodic visits to each one of those sub-licensee's premises to audit and review their records and systems, so as to ensure compliance with the terms and conditions of the Controlling Agreement. Notwithstanding that provision, WSG or its delegated representative has allegedly denied ServiTech the right to audit the sub-licensees in Ecuador freely, including by imposing unjustified conditions on its visits.

ServiTech asserts various legal claims against WSG based on these facts.  First, it alleges that WSG breached the Controlling Agreement by permitting use of the software in

---

[3] The Amended Complaint states the rights were obtained from "WSA," but that appears to be a typo.

substantially more than thirty credit unions in Ecuador, with the knowledge, authorization, assistance and support of WSG's representative in Ecuador.  Second, it alleges that WSG failed to ensure and enforce timely discontinued use of the licensed software after June 30, 2013, which is the date ServiTech contends the Controlling Agreement terminated.  Third, it alleges that WSG failed to make more than $50,000 in payments it owed ServiTech from January until June of 2013.  Finally, ServiTech alleges that WSG violated both the Controlling Agreement and Wis. Stat. § 134.90 by misappropriating its trade secrets.

## II.  WSG's Counterclaims

WSG alleges that it has a contract with Red Transaccional Cooperativa S.A. ("RTC"), an Ecuadorian company, through which WSG offers financial products and services to credit unions.  Not coincidentally, WSG also owns 37% of RTC.

In addition, WSG has established long-term business relationships with a number of third-party vendors to ensure the delivery of quality products and services to credit unions at reasonable prices.  Apparently, one of those vendors is ServiTech.  WSG entered into the original License Agreement (dkt. #16-1), under which ServiTech agreed to develop, refine and support software and switches for ATM services for credit unions.  Before entering into the License Agreement, ServiTech's legal representative, Ricardo Nicolás Martinez, was allegedly informed that WSG planned to sub-license any software ServiTech developed under that agreement to RTC, which would then sub-license the software to credit unions in Ecuador.  Thereafter, the parties entered into the Controlling Agreement (dkt. #16-2), which governed their relationship from July 31, 2011, until the contract ended on June 30, 2013.

As early as 2010, Martinez informed WSG on behalf of ServiTech that a company called DataCarrier S.A. was ServiTech's representative and affiliate in Ecuador.  In that capacity,

DataCarrier provided software and services to credit unions in Ecuador; it also provided invoices for those products and services to RTC, which paid the invoices upon receipt.

During the parties' relationship, ServiTech allegedly failed to provide adequate support for its software; failed to update or improve the software; interfered with access to the RTC network, which impaired the functioning of the ATM system; failed to install updated switches in Bolivia; maintained an inadequate ticketing system to receive information about software problems; did not address problems with ATM PIN pads in Bolivia; and delayed responses to specific problems with the software for periods up to 87 days.

In 2012, the Ecuadorian government instituted new rules for debit cards requiring chip and PIN technology for ATMs.  WSG decided to circulate a Request for Proposal ("RFP") to vendors to provide software and switches using the new technology.  While ServiTech was among a number of other vendors responding to the RFP, WSG selected a different vendor. WSG allegedly rejected ServiTech based on its insufficient response to the RFP and the long history of inadequate support.  On January 24, 2013, WSG notified ServiTech that it would not be renewing their contract.

On January 25, 2013, ServiTech sent a letter to WSG's Vice Chairman, Brian Branch, terminating the Controlling Agreement without citing any provisions of that agreement as justification for the termination.  On February 6, 2013, in-house counsel Michael Edwards, on behalf of WSG and its parent, responded by (1) reminding ServiTech that under the terms of the Controlling Agreement, the earliest possible termination date was June 30, 2013; and (2) advising that WSG expected ServiTech to meet its contractual obligations through the end of June 2013.  On February 8, 2013, for the first time, ServiTech alleged that WSG had exceeded the number of sub-licenses it was permitted by the Controlling Agreement.

WSG alleges five specific claims: (1) breach of the License Agreement; (2) breach of the Controlling Agreement; (3) breach of the implied covenant of good faith and fair dealing; (4) violation of Wis. Stat. § 100.18, which prohibits fraudulent representations; and (5) indemnification.

OPINION

Because both parties answered before filing their respective partial motions to dismiss, the court will treat those motions as motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *See McMillan v. Collection Prof'ls*, 455 F.3d 754, 757 n.1 (7th Cir. 2006). Generally, a motion under Rule 12(c) challenging the sufficiency of the pleadings in the complaint is reviewed under the same basic legal standard as a Rule 12(b) motion to dismiss. *Loud Records LLC v. Minervini*, 621 F. Supp. 2d 672, 676 (W.D. Wis. 2009). Specifically, the court will grant a Rule 12(c) motion "only if 'it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.'" *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (quoting *Craigs, Inc. v. Gen. Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993)). In resolving a Rule 12(c) motion, the court accepts as true all well-pleaded facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Loud Records*, 621 F. Supp. 2d at 676.

## I.  WSG's Motion to Dismiss

WSG moves to dismiss what it deemed Count VI of ServiTech's amended complaint, alleging a violation of Wis. Stat. § 134.90, Wisconsin's version of the Uniform Trade Secrets Act. WSG argues that ServiTech's complaint does not plead this claim sufficiently because it fails to identify the trade secrets in question with a reasonable degree of precision and specificity. In response, ServiTech argues that it need not plead the trade secrets in detail.

Referring to the Rule 12(b)(6) standard, ServiTech maintains that its trade secrets are adequately identified by reference to the License Agreement and Controlling Agreement.  At least at the pleading stage, the court agrees that is enough to identify its software generally as the trade secret in question.

To set forth a cause of action under the Wisconsin Trade Secrets Act ("WTSA" or "the Act"), the plaintiff must show that:  (1) the information at issue is a "trade secret," and (2) that a "misappropriation" or "threatened misappropriation" of that information occurred.  *Radiator Exp. Warehouse, Inc. v. Shie*, 708 F. Supp. 2d 762, 766 (E.D. Wis. 2010) (citing *Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 853-54, 434 N.W.2d 773 (1989)).  The Act defines "trade secret" as:

> [I]information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1.        The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> 2.        The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c).

WSG appears to challenge only the first element, arguing that ServiTech's broad identification of its "software" as a trade secret is insufficient to indicate *which* software ServiTech means, but it cites no statute or case law directly on point supporting its argument that the WTSA established a heightened *pleading* standard.  Instead, WSG cites to cases like *IDX Systems Corporation v. Epic Systems Corporation,* 285 F.3d 581 (7th Cir. 2002), in which the Seventh Circuit held that a plaintiff's broad claim under the WTSA that "all information in or about [a plaintiff's] software is a trade secret" was too vague to survive summary judgment.  *Id.*

at 583-84; *accord Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated.  The plaintiff must show concrete secrets."). However, the Seventh Circuit did *not* say in *IDX Systems* that its holding applied at the *pleadings* stage, nor do any of the other cases that WSG identifies uphold such a proposition.  *See Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595-96 (affirming denial of motion for judgment as a matter of law); *Composite Marine Propellers*, 962 F.2d at 1266 (reversing jury verdict for failure to establish concrete trade secrets); *IDX Sys. Corp. v. Epic Sys. Corp.*, 165 F. Supp. 2d 812, 816 (W.D. Wis. 2001) (granting summary judgment for failure to describe trade secrets in sufficient detail for jury to find they met the statutory definition); *ECT Int'l, Inc. v. Zwerlein*, 228 Wis. 2d 343, 597 N.W.2d 479 (Ct. App. 1999) (generalizations in complaint were not enough to survive summary judgment).

None of these cases points to a heightened pleading standard applicable to the WTSA, nor has the court's own research revealed any such rule.  On the contrary, this court's decision in *IDX Systems Corporation* pointedly distinguished between the specificity required at pleadings and summary judgment stages:  "[a]t the complaint stage, . . . plaintiff is not and cannot be expected to plead its trade secrets in detail."  165 F. Supp. 2d at 816.  At this stage, plaintiff need only allege enough facts to make its claim for relief plausible and to put WSG on notice of the secrets allegedly misappropriated.  *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1027-28 (E.D. Wis. 2010); *Radiator Exp. Warehouse*, 708 F. Supp. 2d at 767; *BondPro Corp. v. Seimens Westinghouse Power Corp.*, 320 F. Supp. 2d 804, 807 (W.D. Wis. 2004) ("A reading of the entire complaint makes it clear that plaintiff considers its manufacturing process for slot cell insulation to be a trade secret. . . . This is enough information to allow defendant to frame an answer.  If defendant needs more specificity, it can obtain it through discovery.").

Here, ServiTech has alleged enough to place WSG on notice that it is accused of misappropriating ServiTech's trade secrets in the form of software confidentially disclosed pursuant to their contract and allegedly provided it without authorization to certain sub-licensees. Certainly, further detail will need to be developed during discovery, *Bond Pro Corp.*, 320 F. Supp. 2d at 807, for this court to determine whether *any* of this software *actually* constituted a trade secret, but that is a fact-intensive inquiry best left for summary judgment, *Radiator Exp. Warehouse*, 708 F. Supp. 2d at 767 n.6.

## II. ServiTech's Motion to Dismiss

ServiTech asks the court to dismiss Count 1 of WSG's amended counterclaims alleging that it breached certain terms of the original License Agreement. (*See* Am. Counterclaims (dkt. #16) ¶¶ 19-21.) Count 1 points to a host of activities occurring before July 3, 2011 (when the Controlling Agreement was executed), that allegedly put ServiTech in breach, including (1) transfer of its interest in the software to DataCarrier without giving WSG notice or the right of first refusal, (2) failure to provide adequate support for the software, (3) failure to update the software and related components and (4) delays in responding to problems.

ServiTech principally argues that by entering into the Controlling Agreement without protest as to the amounts previously paid under the License Agreement, WSG is legally barred from challenging those payments now under the so-called "account stated" and "voluntary payment" doctrines.[4] Generally, the voluntary payment doctrine "places upon a party who wishes to challenge the validity or legality of a bill for payment the obligation to make the

---

[4] ServiTech also briefly asserts that (1) WSG failed to allege damages arising from the alleged breach, and (2) WSG does not have standing. These two arguments -- each of which is raised in a single sentence in the final paragraph of ServiTech's brief -- are so underdeveloped as to merit no discussion. *See, e.g., United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("We have repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]").

challenge either before voluntarily making payment, or at the time of voluntarily making payment." *Putnam v. Time Warner Cable of Se. Wis., Ltd. P'ship*, 2002 WI 108, ¶ 13, 255 Wis. 2d 447, 649 N.W.2d 626. The account stated doctrine is not so much "doctrine" as it is a cause of action based on a contract in which the parties have agreed upon a balance due. In the context of a claim on account stated, "the retention of a statement of an account by a party without making an objection thereto within a reasonable time is evidence of acquiescence in or assent to the correctness of the account." *Onalaska Elec. Heating, Inc. v. Schaller*, 94 Wis. 2d 493, 502-03, 288 N.W.2d 829 (1980). Because WSG allegedly entered into the Controlling Agreement without challenging ServiTech's alleged breach under the License Agreement, ServiTech contends that any claim on that breach is barred pursuant to one or both of these doctrines.

The fundamental problem with ServiTech's argument for dismissal of Count 1 is that WSG neither challenges the validity or legality of the payments it made to ServiTech nor contends that the accounting between the parties is incorrect.[5] Rather, Count 1 pleads a breach of contract -- ServiTech's alleged failure to comply with the terms and conditions of the Controlling Agreement by providing certain services -- and seeks compensatory damages for that breach. WSG does *not* appear to seek reimbursement for payments it made under the License Agreement, which is the context in which the voluntary payment doctrine operates as a bar. *See Putnam*, 2002 WI 108, ¶ 14 (voluntary payment doctrine operates to bar repayment of erroneous judgment, repayment of interest overpaid on a loan, and repayment of taxes paid on tax-exempt property). Nor does WSG appear to challenge an amount it allegedly owes

---

[5] "The theory of account stated is that a debtor has admitted a debt and promised to pay it." *Stan's Lumber, Inc. v. Fleming*, 196 Wis. 2d 554, 569, 538 N.W.2d 849 (Ct. App. 1995). Thus, "[i]t is the balance agreed upon, and not the constituent items, that constitutes a cause of action on an account stated." *Onalaska*, 94 Wis. 2d at 500.

ServiTech, which is the context in which an account stated would presumptively establish ServiTech's claim to money owed.  *See Onalaska*, 94 Wis. 2d at 500-01.

Moreover, ServiTech has identified no case in which either the voluntary payment doctrine or the account stated doctrine bars a subsequent breach of contract action seeking compensatory damages.  Nor does the rationale behind either doctrine apply.  Certainly, as the voluntary payment doctrine states, "a person who receives payment from another without any protest from the payor should be allowed to rely on use of the funds without risking a subsequent demand for return of payment."  *Putnam*, 2002 WI 108 at ¶ 30.  But WSG has *made* no such demand for return of payment.  Nor does WSG seek to *avoid* making payments on its account.  Rather, at least as pled, WSG seeks to enforce the contractual rights for which it paid, not void the contract and seek a refund.

ServiTech's argument may be better characterized as an argument that WSG has waived its right to bring a breach of contract claim.  "Waiver of strict performance or breach may . . . be found when a party to a contract, with knowledge of defective performance, makes payment or receives money in performance of the contract."  *See Contract Law in Wisconsin* § 12.70, at 76 (3d ed. 2012).  Wisconsin's general rule is that a partial or total payment on a contract does not constitute acceptance of the work insofar as latent defects are concerned, but payment with knowledge of a particular defect does constitute a waiver in the absence of other circumstances militating against waiver.  *Id.* at 76-77; *see also Milaeger Well Drilling Co., Inc. v. Muskego Rendering Co.*, 1 Wis. 2d 573, 580, 85 N.W.2d 331 (1957) (citing *Guschl v. Schmidt*, 266 Wis. 410, 417, 63 N.W.2d 759 (1954)).

Even under that framework, however, there is no basis to dismiss Count 1 of WSG's Amended Counterclaims on the pleadings.  ServiTech may potentially be able to prove that WSG has waived its claims for breach of contract by entering into the Controlling Agreement,

10

or ratified a modification of the License Agreement by making voluntary payments despite ServiTech's alleged breach of the License Agreement.  But neither possibility is grounds for granting a Rule 12(c) motion, since either should only be granted when it "appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Craigs, Inc.*, 12 F.3d at 688.  Here, WSG may be able to prove that at least *some* of ServiTech's alleged breaches were not known to it at the time of payment or at the execution of the Controlling Agreement, or that other circumstances exist that would make waiver inappropriate.  As above, the need for more fact-intensive inquiry makes these issues best left for summary judgment.[6]

ORDER

IT IS ORDERED that:

1) Defendant WOCCU Services Group, Inc.'s Motion to Dismiss (dkt. #7) and Plaintiff Servicios Technologicos de Guatemala, SA's Motion to Dismiss Counterclaims (dkt. #11) are DENIED as moot.

2) Defendant's Motion to Dismiss Amended Complaint (dkt. #15) is DENIED.

3) Plaintiff's Motion to Dismiss Amended Counterclaim (dkt. #18) is DENIED.

Entered this 5th day of August, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[6] Additionally, the court notes that the License Agreement, which is attached to WSG's Counterclaims and is thus part of its pleadings, Fed. R. Civ. P. 10(c), contains a provision indicating that "[t]he failure of either party to insist, in any one or more instances, upon performance of any term or condition of this Agreement shall not be construed as a waiver or a relinquishment of any right granted hereunder or of the future performance of such term or condition."  (*See* Am. Counterclaim Ex. A (dkt. #16-1) § 6.14.)